FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

2018 SEP 26 PM 3: 06

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS FLORIDA

GREY OAKS COUNTRY CLUB, INC.,

    Plaintiff,

v.                                    CASE NO.:

ZURICH AMERICAN INSURANCE COMPANY,

2:18-cv-639-FtM-99CM

    Defendant.

_____/

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES Plaintiff Grey Oaks Country Club, Inc. ("Grey Oaks"), by and through its attorneys, and for its complaint against Defendant, Zurich American Insurance Company ("Zurich"), respectfully states as follow:

### NATURE OF THE ACTION

1. On September 10, 2017, the property and golf courses at Grey Oaks Country Club in Naples, Florida were decimated when Hurricane Irma made landfall with wind gusts exceeding 140 miles per hour and sustained winds of nearly 100 miles per hour. The storm shut down Grey Oaks indefinitely as emergency efforts were made to address physical building damage and the task began of restoring three championship golf courses.

2. Grey Oaks was covered during this time by an insurance policy purchased from Zurich, which issues policies to countless golf courses throughout the state of Florida. Zurich agreed to insure Grey Oaks for the losses it suffered as a result of the

storm, including damage to real property, golf course outdoor grounds remediation, and business interruption.

3. With damage and losses extending well into the eight figures, Zurich has made every effort to avoid its contractual obligations and force Grey Oaks into accepting a fraction of what is rightfully owed under the policy. In the year after Hurricane Irma, the insurer failed to adequately investigate the facts underlying Grey Oaks' claim, declined to timely communicate or provide coverage positions, misrepresented policy provisions, and knowingly refused to pay undisputed amounts due under the policy. All of this conduct, by definition, constitutes unfair claim settlement practices under Florida law.

4. Grey Oaks paid a premium for coverage from Zurich and, like any policyholder, expected to be fully compensated for covered damage and losses due to a hurricane. As set forth below, Zurich has breached its insurance contract by refusing to pay the amounts owed under the policy.

## PARTIES

5. Plaintiff, Grey Oaks, is a Florida corporation with its principal place of business at 2400 Grey Oaks Dr. North, Naples, Florida 34105. Grey Oaks is the Named Insured under the subject insurance policy issued by Zurich.

6. Defendant, Zurich, is a New York corporation with its principal place of business in Schaumburg, Illinois. Zurich is authorized to sell insurance in the state of Florida and, on information and belief, is actively engaged in the business of selling

insurance both in Collier County and throughout the state of Florida. Zurich issued the subject insurance policy to Grey Oaks at Grey Oaks' principal address in Naples, Florida.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as the matter in controversy exceeds $75,000 exclusive of interest and costs, and the parties are citizens of different states.

8. This Court has personal jurisdiction over the Defendant because Zurich: (1) is an authorized insurer in the state of Florida, (2) generally transacts business throughout the state of Florida, (3) contracted to insure a Florida corporation with its principal place of business in this judicial district, and (4) contracted to insure property located in this judicial district.

9. Venue is properly placed under 28 U.S.C. § 1391, as this is a diversity action and the property that is the subject matter of this action is situated in this judicial district.

## FACTS

### Hurricane Irma Strikes Naples and Grey Oaks

10. Hurricane Irma made landfall over the greater Naples area on September 10, 2017 as a Category 3 storm. Naples experienced the strongest recorded wind gusts in Florida (in excess of 140 miles per hour) and endured flooding from rainfall and storm surge that was experienced throughout the state.

11. Grey Oaks is situated less than five miles from downtown Naples on 1233 acres of land that contains, among other things, two clubhouses and three championship golf courses.

12. The hurricane damage to Grey Oaks' clubhouses and golf courses immediately brought its operations to a halt.

13. The physical building damage was substantial. The main clubhouse suffered damage throughout the structure, requiring repairs to, among other things, the building's exterior, roof, dining room, grille area, multipurpose rooms, men's locker room, and the main hallway. The clubhouse also required emergency response services immediately after the storm to remediate extensive water damage.

14. The Estuary clubhouse suffered comprehensive roof damage that still requires removal and replacement all the way down to the plywood decking.

15. The damage to Grey Oaks' outdoor areas exposed to the elements was even more extensive and costly. In the storm's immediate aftermath, debris was strewn throughout the property. Grey Oaks was forced to hire a third party to assist its grounds crew in collecting and staging the debris so it could be shredded or hauled off the property.

16. Grey Oaks maintains landscaping and trees around the clubhouse, sales office, and throughout three championship golf courses. After the storm, Grey Oaks had these areas evaluated by tree experts in order to assess the damage and provide estimates on the cost of restoring the property.

17. The experts examined nearly 7,000 trees and provided estimates for restoration costs that included pruning, tree removal, structural support, and palm crown monitoring. They also provided replacement cost estimates for those trees that could not be rehabilitated. The total damage assessment extended well into the seven figures, and has only grown since then as additional work and replacement has been required.

18. Grey Oaks was also forced to take immediate action after Hurricane Irma regarding the Estuary golf course, which was undergoing renovation at the time. The storm effectively wiped out the course's grass work, which required the club to sod many areas to get the course in playable condition. Despite Grey Oaks' diligent efforts, this course still opened two months behind schedule.

19. Grey Oaks' closure also caused substantial business interruption and a loss of income that otherwise would have been generated.

20. In the storm's aftermath, all of Grey Oaks' facilities remained closed for approximately fourteen days. On or about September 24, 2017, the clubhouses reopened on a limited basis with partial food service. Golf did not resume on any of the courses until on or about September 22, 2017, when one was deemed to be in a playable condition. A second course reopened on or about November 1, 2017.

21. Business income entirely ceased during the period that all of Grey Oaks' facilities were closed. That income loss continued after the clubhouses had a limited reopening, as customer volume had decreased and no income was being generated in connection with the golf courses. Even after the golf courses became playable, the

amount of play and associated merchandise and food and beverage sales were depressed for an extended period of time compared to prior years.

22. Despite reopening the clubhouses and golf courses for business as soon as reasonably possible after the storm, Grey Oaks' loss of business income extended well into the six figures.

23. Grey Oaks' efforts to fully restore its grounds and golf courses remain ongoing, as the club is still in the process of assessing tree loss and procuring replacements. The club anticipates that work due to Hurricane Irma will continue at least into the summer of 2019.

24. To date, Grey Oaks' total losses for outdoor grounds remediation, building damage, and business interruption already extend into the eight figures. This amount is still increasing as the work related to Hurricane Irma continues.

## Zurich's Failure and Refusal to Pay All Amounts Owed Under Grey Oaks' Commercial Property Insurance Policy

25. Grey Oaks purchased commercial property insurance policy number CPO 2881188-11 (the "Policy") from Zurich with a Policy Period from October 1, 2016 through October 1, 2017.

26. Grey Oaks paid all premiums due and the Policy was in full force and effect at the time of Hurricane Irma.

27. Grey Oaks reported the property damage caused by Hurricane Irma in the immediate aftermath of the storm in accordance with the Policy's terms.

28. Grey Oaks also maintained detailed records of the damage, including assessments of the damage to be repaired, estimates compiled by professionals for their

work, and evidence of payment for the work performed. The club further complied with each and every request for documentation or information received from Zurich.

29. Zurich proceeded to make four separate payments to Grey Oaks between October 2017 and February 2018 totaling $2,836,366.76. These payments included: (1) $2,000,000 on or about October 6, 2017; (2) $499,999 on or about February 2, 2018; (3) $182,760 on or about February 12, 2018; and (4) $153,607.76 on or about February 14, 2018.

30. With the exception of the final payment for water mitigation, Grey Oaks was not advised what these payments were made for, which coverages the payments were being made under, and what amounts (if any) Zurich was disputing.

31. On February 19, 2018, Grey Oaks wrote to Zurich's claims adjuster asking two simple questions: (1) "What is Zurich prepared to reimburse [Grey Oaks] for [?]," and (2) "What is [Zurich] not willing to reimburse [Grey Oaks] for related to our Hurricane Irma damage which includes clean-up, repairs, re-plantings, business interruption, etc. [?]"

32. Zurich refused to answer either of these questions.

33. For an entire year after Hurricane Irma, the insurer refused to (1) provide a written coverage position regarding each of the insuring agreements under the Policy, (2) explain the amounts for which it had already made payment, (3) identify any aspect of the claim that it believed was uncovered, or (4) pay additional undisputed amounts under the Policy.

34. On September 12, 2018 – over a year after Hurricane Irma struck – Zurich provided this information by letter in response to yet another demand from Grey Oaks.

35. Zurich's September 12, 2018 letter was telling. As of its last payment to Grey Oaks on or about February 14, 2018, the insurer had tendered a total of $2,836,366.76 on the claim. Yet, based on information in its possession since the beginning of 2018, Zurich acknowledged responsibility for losses and damages totaling $3,971,016. By Zurich's own valuation of Grey Oaks' claim, it was knowingly withholding an undisputed payment of $1,134,649.73 for seven months.

36. Zurich issued over $50 million in coverage solely in connection with the insuring agreements at issue. The insurer nonetheless maintains that the Policy only covers $3,971,016 of damages and losses.

37. Grey Oaks' actual damages that extend into the eight figures are within the applicable limits of the insuring agreements at issue.

38. Zurich refuses to make additional payment under the Policy and has effectively denied coverage for the balance of Grey Oaks' claim.

**The Available Coverage for Grey Oaks' Losses**

39. The Policy contains multiple insuring agreements that respond for the losses at issue.

A. *The Golf Course Outdoor Grounds Coverage*

40. Grey Oaks purchased a Golf Course Outdoor Grounds Coverage endorsement with the Policy. The insuring agreement under this coverage form provides:

"We will pay for direct physical loss of or damage to Golf Course Outdoor Grounds at a Premises directly caused by...[w]indstorm or hail."

41. Capitalized words and phrases are specifically defined by the Policy and have the same meaning when referenced herein.

42. Golf Course Outdoor Grounds is defined as "(a) Fairways, greens, tees, rough areas, out-of-bounds areas, sand traps, driving ranges; and (b) Land, lawns, trees, shrubs, and plants."

43. Premises means, in relevant part: "A location scheduled on the Declarations for this Commercial Property Coverage Part.

    a. If the location is described by an address only, it includes the area associated with that address in which you are legally entitled to conduct your business activities and includes that area extending 1,000 feet beyond the address.

    b. If the location is described by an address and further described by geographic boundaries, it includes only the area within such geographic boundaries in which you are legally entitled to conduct your business activities and includes that area extending 1,000 feet beyond that area."

44. Zurich agreed to pay for covered loss or damage as follows:

"1) For physical loss of or damage to trees:

    a. We will pay for the reasonable and necessary costs for:

        i. A qualified tree surgeon to determine the extent of the loss or damage; and

    ii. Repairs to return the damaged tree to a condition as close as possible to its condition prior to the loss or damage; or

  b. If repair to the damaged tree is impossible or impractical, we will pay for the reasonable and necessary costs of:

    i. A qualified contractor to remove the damaged tree from the Premises; and

    ii. A replacement tree of similar type, size and quality to the damaged tree, including reasonable replanting costs.

* * *

2) For physical loss of or damage to Golf Course Outdoor Grounds other than trees, the reasonable and necessary costs to replace the damaged Golf Course Outdoor Grounds with that of similar type, size, and quality to that which was damaged, including reasonable replanting, repairing, and installation costs. We will make no payment until such repair, replacement, installation, or replanting is actually made."

45. The Golf Course Outdoor Grounds Coverage further states: "The most we will pay under this Additional Coverage at any one Premises and for any one tree, shrub or plant are the Limits of Insurance shown on the Declarations for Golf Course Outdoor Grounds."

46. In connection with this coverage, the Policy provides a Limit of Insurance of "$500,000 Per Premises" and "$5,000 Per Tree, Shrub, or Plant."

47. The Policy contains a Schedule of Locations which, as amended by endorsement, specifically lists 19 individual buildings/locations on Grey Oaks' property and identifies the structure insured.

48. With 19 Premises and a limit of $500,000 per Premises, the Policy provides an aggregate limit of liability of $9,500,000 under the Golf Course Outdoor Grounds Coverage.

49. This coverage was obtained in light of the substantial landscaping around Grey Oaks' golf grounds, which contains an eight-figure value in trees alone.

50. Grey Oaks has already incurred costs in excess of $5 million solely in tree replacement due to Hurricane Irma.

### B. *The Real and Personal Property Coverage Form*

51. The insuring agreement under this coverage form provides: "We will pay for direct physical loss of or damage to Real Property and Personal Property at a Premises directly caused by a Covered Cause of Loss. We will not pay more in any one occurrence than the applicable Limit of Insurance shown on the Declarations for such loss of or damage to Covered Property at that Premises."

52. Real Property is defined to include, in relevant part, "(a) Buildings, including their Green Roofing Systems; [and] (b) Permanent structures."

53. Personal Property includes, in relevant part, "(a) Your Personal Property; [and] (b) Your Employees' Personal Property." Your Personal Property means "personal property owned by you." Your Employees' Personal Property means "personal property

11

owned by your officers, directors, partners, Managers, Members, or employees (including leased or temporary employees)."

54. Covered Cause of Loss means "a fortuitous cause or event, not otherwise excluded, which actually occurs during this policy period."

55. As amended by endorsement, there is a Limit of Insurance of $34,068,835 for Real Property and $14,647,421 for Personal Property (excluding personal property of others).

C. *Debris Removal Coverage*

56. The Policy contains an Additional Coverages Form, wherein subsection (5) extends coverage for Debris Removal. The insuring agreement provides, in relevant part:

> a. We will pay your expense to remove debris of Covered Property, for which a Limit of Insurance is shown on the Declarations, remaining after a Covered Cause of Loss. The most we will pay under this Additional Coverage for Debris Removal is the remaining applicable Limit of Insurance for the Covered Property shown on the Declarations after payment of the covered physical loss or damage.
> If the total of the loss or damage and debris removal expense exceeds the applicable Limit of Insurance, we will pay the remaining debris removal expenses. The most we will pay under this Additional Coverage in any one occurrence is the Limit of Insurance shown on the Declarations for Debris Removal – Supplemental Limit.

    b. If wind causes direct physical loss of or damage to Covered Property, we will also pay for the expenses you incur to remove debris of uncovered property that is blown on to the Premises or Reported Unscheduled Premises by wind and to remove debris of Outdoor Trees, Shrubs, Plants, or Lawns damaged by wind.

The most we will pay under this Additional Coverage in any one occurrence is the Limit of Insurance shown on the Declarations for Debris Removal – Uncovered Property.

    c. Outdoor Trees, Shrubs, Plants or Lawns are defined as "outdoor trees, shrubs, plants, grass, or lawns you own."

    d. In the Policy Declarations governing the Additional Coverages, the Limit of Insurance is stated as "Covered" for "Debris Removal – Covered Property," $250,000 Per Occurrence for "Debris Removal – Supplemental Limit," and $2,500 Per Occurrence for "Debris Removal – Uncovered Property."

57. Grey Oaks incurred losses in connection with debris removal on its property after Hurricane Irma, for which Zurich has failed or refused to acknowledge coverage under the Policy.

D. *Business Income Coverage*

58. The Business Income Coverage form contains a section of Additional Coverages, wherein subsection (4) is entitled "Expense to Reduce Loss."

59. The insuring agreement provides: "We will pay reasonable and necessary expenses you incur, except the cost of extinguishing a fire, to reduce the amount of loss of Business Income. We will pay for such expenses to the extent that they do not exceed the amount of loss that otherwise would have been payable under this Coverage Form and subject to the applicable Limit of Insurance shown on the Declarations for Business Income at that Premises or Reported Unscheduled Premises."

60. Business Income is defined as "(a) Net Income; plus Continuing Expenses." Net Income means "the net profit or loss, including rental income from tenants, that would have been earned or incurred before taxes." Continuing Expenses means, in relevant part, "Your continuing normal operating expenses including, but not limited to...(1) Payroll; (2) Rental payments as tenants; and (3) Factory overhead."

61. The Policy contains a Limit of Insurance of $821,000 for Business Income.

62. Grey Oaks incurred extra expenses after Hurricane Irma in order to reduce the loss of business income, for which Zurich has failed or refused to acknowledge coverage under the Policy.

**Compliance with All Conditions Precedent**

63. Grey Oaks has satisfied all of the applicable terms, conditions, and other requirements of the Policy. Alternatively, compliance with the applicable terms, conditions, and other requirements in whole or in part has been waived, excused, or is unnecessary for other reasons.

**Retention of Counsel**

64.     Grey Oaks has retained the law firm of Hunton Andrews Kurth LLP and its attorneys to represent the club in this action and has agreed to pay it reasonable attorneys' fees, plus all expenses incurred, for its services.

## COUNT I – BREACH OF CONTRACT

65.     Grey Oaks re-alleges the preceding paragraphs as if fully set forth herein.

66.     <u>The Contract:</u>  At all material times, Grey Oaks was insured under the Policy, which is a binding, valid, and enforceable contract under Florida law.

67.     The damage to Grey Oaks' clubhouses and golf course grounds, along with the club's efforts to clean up debris and mitigate its business income loss are covered under the Policy's Golf Course Outdoor Grounds Coverage, Real and Personal Property Coverage, Debris Removal Coverage, and Business Income Coverage.  None of the terms, provisions, conditions, or exclusions in the Policy apply to bar coverage.

68.     <u>Breach:</u>  Zurich, through the acts of its agents, representatives, and/or employees, failed to perform its duties and/or obligations under the Policy and thus breached the contract by its acts or omissions as alleged herein, including without limitation, its failure and refusal to compensate Grey Oaks for the full amount of its damages and loss resulting from Hurricane Irma.

69.     <u>Damages:</u> As a direct, proximate, and natural result of Zurich's breaches, Grey Oaks has been deprived of the benefits due under the Policy.

WHEREFORE, Plaintiff Grey Oaks Country Club, Inc. demands judgment against Defendant, Zurich American Insurance Company, for damages, pre- and post-

judgment interest, attorneys' fees pursuant to Fla. Stat. § 627.428, costs, and any further relief this Court deems equitable, just, and proper.

## JURY DEMAND

Grey Oaks hereby demands trial by jury.

Dated: September 26, 2018

HUNTON ANDREWS KURTH LLP

_/s/ W. Andrews_
Walter J. Andrews - Trial Counsel
Fla. Bar No. 84863
Michael J. Mueller
Fla. Bar No. 114938
Cary D. Steklof
Fla. Bar No. 86257
HUNTON ANDREWS KURTH LLP
1111 Brickell Avenue, Suite 2500
Miami, Florida 33131
Tel: (305) 810-6407
Facsimile: (305) 810-2460
wandrews@HuntonAK.com
mmueller@HuntonAK.com
csteklof@HuntonAK.com

*Attorneys for Plaintiff, Grey Oaks Country Club, Inc.*